## NATURAL RESOURCES DEFENSE COUNCIL, INC., et al.

### v.

### Howard H. CALLAWAY, as Secretary of the Army, et al.

### Civ. No. H–74–268.

United States District Court, D. Connecticut.

Dec. 13, 1974.

Haynes N. Johnson, Stamford, Conn., Albert K. Butzel, New York City, for plaintiffs.

Henry S. Cohn, Asst. U. S. Atty., Hartford, Conn., for defendants.

## MEMORANDUM OF DECISION

BLUMENFELD, District Judge.

The plaintiffs here, groups representing environmental and general public interests, seek to halt a major governmental project because the agencies involved have allegedly made both substantive and procedural mistakes in complying with applicable environmental protection laws.

The origin of this suit lies in the Navy's current project of dredging a wider and deeper channel in the Thames River above New London to allow a new class of submarine (the SSN 688) to use the Navy's submarine facility at Groton.[1] The dredging itself is not being challenged here; instead the challenge is directed at the disposition of the dredged spoil at the "New London dump site," which lies approximately two nautical miles directly off the entrance to New London Harbor and about one-and-one-half nautical miles to the west of Fishers Island in Long Island Sound.[2]

The total of the Navy's dredging is calculated as some 2.8 million cubic yards of spoil.[3] The project is scheduled to be done in two phases. Phase I, which began August 3, involves dredging the Thames River channel from a depth of 33 feet to a depth of 36 feet between the river's mouth and the Underwater Systems Center (about halfway to the submarine base) and deepening the entrance to the Systems Center to 38

---

1. The SSN 688, also known as the "Los Angeles" Class, is a new and larger class of nuclear high-speed attack submarine that has a draft of 32 feet. A number of these new vessels are scheduled to be homeported eventually at the submarine base in Groton. The first is to arrive from its builder in Newport News, Virginia, in July of 1975. The second, and 18 of the first 23, are to come from the Electric Boat Division of General Dynamics, whose plant is located in Groton. *See* Exh. 6A, 1 Final Environmental Impact Statement: Dredge River Channel ¶ 1.21 (Dec. 1973); Testimony of Adm. Steven A. White, Transcript (Sept. 12, 1974) 350–356.

2. *See, e. g.,* Exh. 6A, *supra* note 1, at 7 fig. 3; Exh. 1, Block Island Sound and Approaches Map (C & GS 1211) (19th ed., Dec. 15, 1973) (New London dump site marked "X").

3. *See* Exh. 6A, *supra* note 1, ¶ 1.06. This quantity is equivalent to a block approximately 1 mile long, 300 feet wide, and 50 feet high. *See* Exh. 13, Affidavit of Dr. W. Frank Bohlen 6.

feet from a present depth of 35 feet.[4] After a hiatus of approximately nine months from the completion of Phase I in June 1975, Phase II will commence.[5] This portion of the project involves dredging the channel from the submarine base to about a mile above the Systems Center from a present depth of 33 feet to a depth of 36 feet.[6]

Concededly, the dredged material will be polluted, with especially high concentrations of volatile solids, industrial wastes, and Kjeldahl nitrogen.[7] The New London dump site is apparently much freer of pollution than the bed of the Thames River, and the plaintiffs fear that the dredge spoil from the Thames will contaminate this relatively purer area.[8] Additionally, the plaintiffs are concerned that dispersal of the spoil from this site will lead to pollution of estuaries and nursery grounds for marine life that exist inshore to the northwest of the dump site along the Connecticut coast.[9] Putting these concerns into the language of a complaint, the plaintiffs argue that the decision to dispose of the dredge spoil at the New London

dump site was "arbitrary and capricious"—a clear abuse of discretion that this court should nullify.[10] This claim will be referred to below as the "substantive" objection to the Navy's project.

The plaintiffs also complain that the agencies involved inadequately complied with procedural requirements for making the decision to use the New London dump site. The parties do not dispute that the spoil disposal project was subject to the requirements of the National Environmental Protection Act, 42 U.S.C. §§ 4321–4347 (1970) (hereinafter "NEPA"). Principal among these requirements is one demanding that an environmental impact statement (hereinafter "EIS") be filed before the project is undertaken.[11] A substantial body of case law has grown up around the issue of exactly what such a statement must contain,[12] and the thrust of many of the plaintiffs' claims is that the Navy's EIS for this project is deficient in omitting required data.[13] A broader but related claim is that the Navy's EIS for this project was not the objective inquiry re-

4. Exh. 6A, *supra* note 1, ¶¶ 1.03–1.05.

5. *See* Plaintiffs' Memorandum in Support of Motion for Injunctive Relief 7–8; Exh. 20, A Proposal for an Environmental Survey of Effects of Dredging and Spoil Disposal in the Thames River and New London Dumping Ground 1 (May 21, 1974).

6. Exh. 6A, *supra* note 1, ¶ 1.04.

7. *See id.* ¶¶ 2.06–2.06h and accompanying figures and tables. The Environmental Protection Agency (hereinafter "EPA") has promulgated regulations which specify what material is polluted for purposes of dumping in "oceans." *See* 40 C.F.R. §§ 227.61–227.64 (1973). Whether or not Long Island Sound is subject to these regulations, *cf.* note 52 *infra*, the Navy, in compiling the environmental impact statement for the project, *cf.* pp. 1268–1269 *infra*, acted as if they applied and compared the composition of bottom sediment from the dredging area with interim EPA guidelines issued pursuant to them. (The source of these guidelines, which are developed at ¶ 3.11 of Exh. 6A, was not further identified for the court; however, they were not challenged and will be accepted by it.) One or more of these samples exceeded each EPA guideline except that for acceptable

concentrations of mercury. *See* Exh. 6A, *supra* note 1, at 40 table 2. *See also* Testimony of Lt. Chas. T. Way, Transcript (Sept. 11, 1974) 32–33.

8. *Cf.* Exh. 13, *supra* note 3, at 6–8; Exh. 14, Affidavit of Dr. Howard M. Weiss 4.

9. *See, e. g.*, Exh. 13, *supra* note 3, at 7–8; Exh. 14, *supra* note 8, at 10; Plaintiffs' Memorandum, *supra* note 5, at 10–11.

10. *See* Plaintiffs' Memorandum, *supra* note 5, at 54–58.

11. *See* 42 U.S.C. § 4332(2) (1970). In an early and perhaps the leading case in the field, Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971), Judge Skelly Wright emphasized strongly the importance of the EIS in the statutory scheme of NEPA. 449 F.2d at 1112–1115.

12. The court notes that one service that specializes in reporting environmental law cases, BNA's Environmental Reporter—Cases (hereinafter "ERC") has grown to six volumes and well over 10,000 pages since 1970.

13. *See* Plaintiffs' Memorandum, *supra* note 5, at 24–50.

quired by NEPA and regulations thereunder [14] precedent to a decision but was instead a self-serving justification for a previously made decision to use the New London dump site.[15] Two other related claims are that (1) the Army Corps of Engineers (hereinafter "the Corps"), not the Navy, should have prepared the EIS, and (2) even if the Navy was properly in charge of preparing the statement, it violated the requirements of NEPA by contracting the preparation of the EIS to a consultant instead of doing all the work on the statement by itself.[16]

The parties do not dispute that the Navy was required by the Water Pollu-tion Control Act to get a permit from the Corps in order to dump the dredge spoil.[17] The Corps granted such a permit on April 29, 1974, conditioning it upon institution of a program to monitor the environmental effects of the dumping.[18] The plaintiffs argue that this action by the Corps was improper (1) because the Navy's underlying EIS of December 1973 was deficient;[19] (2) because the Corps itself failed to comply with applicable guidelines developed by the Environmental Protection Agency;[20] and (3) because the monitoring program gives no protection against harmful dispersion of the spoil—it simply records it.[21]

14. *See, e. g.*, Council on Environmental Quality (hereinafter "CEQ"), Guidelines for the Preparation of Environmental Impact Statements §§ 1500.2, 1500.7, 38 Fed.Reg. 20550, 20552 (1973) ; Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1114–1115, 1127–1128 (1971) ; Environmental Defense Fund, Inc. v. Armstrong, 352 F.Supp. 50, 55 (N.D.Cal.1972), aff'd, 487 F.2d 814 (9th Cir. 1973) ; Daly v. Volpe, 350 F.Supp. 252, 259 (W.D.Wash. 1972).

15. *See* Plaintiffs' Memorandum, *supra* note 5, at 19–24.

16. *See id.* at 51–54.

17. 33 U.S.C. § 1311(a) (Supp. II, 1972) provides that "[e]xcept as in compliance with . . . [the Federal Water Pollution Control Act] the discharge of any pollutant by any person shall be unlawful." "The term 'pollutant' means dredged spoil . . . ." 33 U.S.C. § 1362(6) (Supp. II, 1972). For disposal of dredged spoil § 1344 of the Act provides :

"(a) The Secretary of the Army, acting through the Chief of Engineers, may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites.

"(b) Subject to subsection (c) of this section, each such disposal site shall be specified for each such permit by the Secretary of the Army (1) through the application of guidelines developed by the [EPA] Administrator, in conjunction with the Secretary of the Army, which guidelines shall be based upon criteria comparable to the criteria applicable to the territorial seas, the contiguous zone, and the ocean under section 403(c), and (2) in any case where such guidelines under clause (1) alone would prohibit the specification of a site, through the application additionally of the economic impact of the site on navigation and anchorage.

"(c) The [EPA] Administrator is authorized to prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site, and he is authorized to deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site, whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas. Before making such determination, the [EPA] Administrator shall consult with the Secretary of the Army. The [EPA] Administrator shall set forth in writing and make public his findings and his reasons for making any determination under this subsection."

18. The permit is Exh. 11 in these proceedings. For a discussion of the events leading up to this action see pp. 1274–1276 *infra*.

19. *See* Plaintiffs' Memorandum, *supra* note 5, at 58–59.

20. *See id.* at 59–61. The application of such guidelines is required by 33 U.S.C. § 1344(b) (Supp. II, 1972). According to the plaintiffs, the appropriate criteria are those for "ocean dumping," promulgated at 40 C.F.R. §§ 227.61–227.64 (1973). *But cf.* note 52 *infra*.

21. *See* Plaintiffs' Memorandum, *supra* note 5, at 61–62. This objection is perhaps best

On the basis of all these alleged violations of law,[22] the plaintiffs ask this court to grant permanent injunctive relief against the continued dumping of dredge spoil from the Thames River project at the New London dump site.[23] After disposing of two preliminary issues, I will turn to the merits of the remaining substantive and procedural objections that the plaintiffs have raised.

## I. *Jurisdiction*

■ The jurisdiction of this court to hear the challenges based on alleged violations of NEPA is indisputably proper under 28 U.S.C. §§ 1331, 1337 (1970). However, the defendants maintain that

characterized as a "substantive" one and will be treated as an element of the claim that the decision to use the New London dump site was arbitrary and capricious. In addition the plaintiffs claim that the required monitoring program is not being carried out. *See id.* at 62.

22. A number of claims have been dropped by the plaintiffs since institution of this action. First, the plaintiffs originally complained that, because of the substantive and procedural shortcomings alleged above, the permit for the dredging in the Thames River, issued by the Corps pursuant to 33 U.S.C. § 403 (1970), was invalid. At this stage the plaintiffs no longer challenge the validity of the dredging. *See* Transcript (Sept. 11, 1974) 5–6. Second, the third count of the plaintiffs' complaint alleges that the Navy failed to recirculate and solicit comments on an addendum to their draft EIS, thereby violating NEPA. This claim is not pressed in the post-trial brief, and indeed the point seems to be conceded. *See* Plaintiffs' Memorandum, *supra* note 5, at 26–27. Third, the plaintiffs originally complained that the EPA failed of its responsibilities by neglecting to enforce conditions it imposed upon the Corps' issuance of the dumping permit to the Navy. However, the plaintiffs now concede that this "issue has dropped out of consideration, and will not be developed at any length in this brief." *Id.* at 17 n.*. Accordingly, this court will not treat the issue as a live one.

23. More particularly, the requests for relief still relevant to the case pray for judgment:
 "A. Declaring that the actions of the Navy in proceeding with its . . . disposal project at New London are contrary to applicable law;

the court does not have jurisdiction of the objections based upon alleged violations of the Water Pollution Control Act.[24] This Act contains a section giving jurisdiction over citizen suits, 33 U.S.C. § 1365 (Supp. II, 1972). One of the requirements of this section is that:

"(b) No action may be commenced—

(1) . . .

(A) prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator [of EPA], (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order . . . .

"B. Declaring null and void, and setting aside, the permit or permits issued by the Corps of Engineers for the project;
"C. Enjoining the Navy and its officers, agents, servants, employees and attorneys, and all persons in active concert or participation with any of them, from proceeding with any action in furtherance of the . . . disposal of resulting spoil at the New London Dumping Ground unless and until there has been full compliance with NEPA . . . and Section 404;
" . . .
"F. Awarding plaintiffs costs and reasonable attorneys' fees and such other relief as may be deemed just and proper under the circumstances."

The plaintiffs originally requested both preliminary and permanent relief. Through agreement of the parties the three-day hearing (held September 11, 12, and 20) on the application for a preliminary injunction was consolidated with the hearing on the merits required for a permanent injunction. *See* Fed.R.Civ.P. 65(a)(2).

At the time of oral argument (October 10) the dumping had been halted and the court was informed that it was not scheduled to resume until October 28. The plaintiffs requested that if the opinion of this court as to permanent relief had not been issued by October 28, the court grant temporary relief pending issuance of the opinion. *See* Transcript (Oct. 10, 1974) 106.

24. The defendants would also challenge the justiciability of an attack on the dredging permit. *See* Brief for Defendants 7; Connecticut Action Now, Inc. v. Roberts Plating Co., 457 F.2d 81 (2d Cir. 1972). Because the plaintiffs disclaim any such attack, I do not reach this issue.

Notice under this subsection shall be given in such manner as the [EPA] Administrator shall prescribe by regulation."

The regulations prescribed are set out in the margin.[25] The plaintiffs gave the required notice on July 15, 1974;[26] the complaint was filed on September 3, 1974, less than 60 days thereafter. Therefore, the plaintiffs' claim to jurisdiction under 33 U.S.C. § 1365 (Supp. II, 1972) must fail.[27] *Cf.* Montgomery Environmental Coalition v. Fri, 366 F.Supp. 261, 265–266 (D.D.C.1973); Brown v. Ruckelshaus, 364 F.Supp. 258, 265 n.10 (C.D.Cal.1973).[28]

## II. *Standing*

The standing of the plaintiffs to assert that the Corps and the Navy have

25. 40 C.F.R. §§ 135.2–135.3 (1973):
"§ 135.2 Service of notice.
"(a) Notice of intent to file suit pursuant to section 505(a)(1) of the Act shall be served upon an alleged violator of an effluent standard or limitation under the Act, or an order issued by the Administrator or a State with respect to such a standard or limitation, in the following manner:
" . . .
"(3) If the alleged violator is a Federal agency, service of notice shall be accomplished by certified mail addressed to, or by personal service upon, the head of such agency. A copy of such notice shall be mailed to the Administrator of the Environmental Protection Agency, the Regional Administrator of the Environmental Protection Agency for the region in which such violation is alleged to have occurred, the Attorney General of the United States, and the Chief administrative officer of the water pollution control agency for the State in which the violation is alleged to have occurred.
" . . .
"(c) Notice given in accordance with the provisions of this part shall be deemed to have been served on the postmark date if mailed, or on the date of receipt if served personally.
"§ 135.3 Contents of notice.
"(a) *Violation of standard, limitation or order.*—Notice regarding an alleged violation of an effluent standard or limitation or of an order with respect thereto, shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.
" . . .
"(c) *Identification of counsel.*—The notice shall state the name, address, and telephone number of the legal counsel, if any, representing the person giving the notice."

26. *See* Exh. C, Stipulation, and second attachment thereto.

27. Moreover, according to the inside address the plaintiffs' letter of notice was not sent to the Administrator of the Environmental Protection Agency or the Attorney General of the United States, as required by 40 C.F.R. § 135.2(a)(3) (1973). (This regulation also requires a copy to be sent to the chief administrative officer of the water pollution control agency in the region in which the violation is alleged to have occurred. The court has not been informed whether the New London dump site is within the jurisdiction of any water pollution control agency, however, so I do not rely upon this possible deficiency.)

28. These alleged violations of the Water Pollution Control Act may not be complained of under some other jurisdictional head (*e. g.*, 28 U.S.C. § 1331 (1970)), even though section 1365 of Title 33 contains a savings clause:
"(e) Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief (including relief against the Administrator or a State agency)."
The Senate Committee on Public Works explained:
"It should be noted . . . that the section would specifically preserve any rights or remedies under any other law. Thus, if damages could be shown, other remedies would remain available. Compliance with requirements under this Act would not be a defense to a common law action for pollution damages." S.Rep. No. 92–414, 92d Cong., 2d Sess. (1971), in 1972–2 U.S. Code Cong. & Admin.News 3746–3747.
Thus, subsection (e) apparently was not intended to allow violations of the Act to be prosecuted, except as they create some rights independent of the Act, other than under the jurisdictional grant of the Act, 33 U.S.C. § 1365 (Supp. II, 1972).

violated NEPA is unchallenged here. The plaintiffs are all groups which assertedly contain numerous members who use Long Island Sound in one way or another. In showing potential actual injury from pollution of the Sound, they have shown enough to have standing to sue under Sierra Club v. Morton, 405 U. S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). *See* Montgomery Environmental Coalition v. Fri, 366 F.Supp. 261, 264 (D.D.C.1973).

### III. *Authorship of the EIS*

One of the plaintiffs' objections is that the Corps and not the Navy should have prepared the EIS. NEPA provides that "the responsible official" shall prepare an impact statement,[29] and the CEQ Guidelines (not issued in final form until August 1973)[30] provide guidance on which federal agency should be the "lead" agency and write the EIS when there is overlapping jurisdiction.[31] The agency selection should turn upon

> "the time sequence in which the agencies become involved, the magnitude of their respective involvement, and their relative expertise in regard to the project's environmental effects."[32]

The plaintiffs contend, somewhat conclusorily, that application of these guidelines to the instant case should have resulted in the Corps' being chosen to write the EIS. The court does not view the guidelines as so pellucid, however. As to the time sequence (and assuming that the guidelines favor the agency who becomes involved at the earlier date), the Navy has the stronger case for being the lead agency since it initiated the dumping project. As to the magnitude of the agencies' respective involvement, it was the Corps that had the statutory authority to select a site. But this was not merely a site selection project; it was a dumping project, and the Navy was to carry out all the actual dumping. As to relative environmental expertise, no data has been presented as to which agency was more experienced prior to January 1972 (when the Navy prepared the first draft of the impact statement).[33]

It is true that where defects of procedure[34] are urged in environmental cases, the standard a reviewing court will apply is very strict:

> "if the decision was reached procedurally without individualized considera-

---

29. *See* 42 U.S.C. § 4332(2)(C) (1970).

30. See note 14 *supra*.

31. In many federal projects different agencies may interact with one another and have partial responsibility for a project. This raises the interesting possibility that as to each agency the project may not be "major." Because NEPA applies to "major *Federal* actions," however, 42 U.S.C. § 4332(2)(C) (1970) (emphasis added), it is clear that all the *federal* parts of a project should be summed in order to determine whether the project is "major" and thus whether NEPA should apply. Concomitantly, if NEPA does apply to a project as a whole it must apply to each of its parts. Here, even though the Corps' responsibility for site selection may or may not have constituted major federal action by itself, the dumping project as a whole was clearly major federal action. Therefore NEPA applies to the project, and all the obligations it imposes fall squarely upon the agencies involved. This does not mean that each must separately comply with each of NEPA's requirements, which would result in multiple impact statements, etc. It

does mean that there must be a valid EIS somewhere in the process, and deficiencies in the EIS will affect all parts of the project —even those being carried on by other agencies. In other words, if the EIS prepared by the Navy is deficient, the deficiency may invalidate the action of the Corps in granting a dumping permit.

32. CEQ Guidelines, *supra* note 14, § 1500.-7(b).

33. The Navy's initial draft statement is Exhibit 3 in these proceedings. The plaintiffs point out that the Corps had prepared a draft statement for their own Thames dredging project by August 1972. The court finds this irrelevant as to the issue of which agency was more knowledgeable when the decision about who was to write the EIS on the Navy project was made sometime prior to January 1972.

34. That is, those that do not challenge the propriety of the ultimate agency decision but instead attack the EIS or the procedures followed by the agency in reaching its substantive decision.

tion and balancing of environmental factors—conducted fully and in good faith—it is the responsibility of the court to reverse." [35]

However even where the challenge is to the procedures followed, the court must be convinced that error has been made. In the present instance the court is unable to conclude, on an examination of the record, that the Navy should not have been designated the lead agency for the dumping project here involved. Without a stronger showing of error, the court is unwilling to upset the agencies' decision that the Navy should draft the EIS. Although admonished by *Calvert Cliffs'* not to accord too much weight to the delay that following NEPA procedures properly might entail,[36] the court finds it noteworthy that if an error in authorship were found here, the government would have to retreat all the way back to the EIS-drafting stage. If the statement were otherwise proper, invalidating the entire EIS process because of a mistake of authorship would be an extraordinarily harsh measure. There is no need to make an abstract decision about the boundary of responsibility between these agencies on which so much would turn. The purposes and policies behind NEPA were fulfilled in this case.

The plaintiffs next argue that if the Navy was properly designated as the "responsible" agency to be charged with preparation of the EIS, it improperly abdicated its duty by contracting the job out to an independent consultant, the Ecosystems Division of Jason M. Cortell & Associates in Cambridge, Massachusetts (hereinafter "Ecosystems").

The Navy itself prepared the initial draft EIS in January 1972. This eight-page document was given to Ecosystems, along with comments received on it, appropriate background information, and instructions.[37] Ecosystems then prepared the much more extensive revised draft EIS and final EIS. Lt. Charles T. Way, the Naval officer principally responsible for the EIS,[38] reviewed and edited these drafts. Way testified that he confined himself to a coordinator's role and did not question the content or accuracy of the studies the consultants used or the conclusions they drew therefrom.[39]

The plaintiffs contend that the Navy's actions here represent an impermissible delegation of its duty as the "responsible official" to prepare the EIS. *See* 42 U.S.C. § 4332(2)(C) (1970); CEQ Guidelines, *supra* note 14, § 1500.7(c). The Second Circuit has been in the forefront of those courts requiring the responsible agency itself to prepare the EIS: a number of cases in this Circuit have held impact statements to be invalid because prepared by someone other than the agency. *See* Greene County Planning Bd. v. Federal Power Comm'n, 455 F.2d 412, 420–422 (2d Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972); I–291 Why? Ass'n v. Burns, 372 F.Supp. 223, 243–247 (D.Conn.1974); Conservation Soc'y v. Secretary of Transp., 362 F.Supp. 627, 629–632 (D.Vt.1973); Committee to Stop Route 7 v. Volpe, 346 F.Supp. 731, 741 (D.Conn.1972). In all of these cases, the concern has been that the EIS preparer, a state agency, had an interest in seeing the project accepted as proposed and would therefore write a biased EIS. Bias in the impact statement, of course, renders impossible the fair and careful evaluation of a project's environmental effects demanded by NEPA. *Cf.* Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic En-

---

35. Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1115 (1971); *see* I–291 Why? Ass'n v. Burns, 372 F.Supp. 223, 240–242 (D.Conn.1974). The basis for this strictness is found in 42 U.S.C. § 4332(2)(C) (1970).

36. *See* 449 F.2d at 1118.

37. *See* Testimony of Lt. Chas. T. Way, Transcript (Sept. 12, 1974) 196–197.

38. *See* Testimony, *supra* note 7, at 22–23.

39. *See* Testimony, *supra* note 37, at 198–200.

ergy Comm'n, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1115 (1971).

■ This case is easily distinguishable. The preparer here was a consultant hired by and fully responsible to the Navy; Ecosystems had no self-interest that would be served by biasing the EIS.[40] The major factor motivating the decisions in the cases cited above is simply not present here. Indeed, there are compelling reasons why federal agencies should be allowed to use outside consultants, making them in effect adjuncts of the agency's own staff for purposes of EIS preparation. A number of federal agencies may not undertake enough projects to make it cost-efficient to hire full-time people to work on impact statements. To prohibit agencies from hiring part-time consultants to do this work might compel them to utilize employees without any special expertise in this area to compile impact statements; an expectable result would be poorly written statements. Alternatively, prohibiting consultants might force agencies to hire full-time people for whom there was only part-time work. With the economy already in a tailspin due to "stagflation," this court will not compel such a wasteful result. I hold that the use of a consulting firm responsible solely to the federal agency charged with preparation of the EIS does not violate the requirements of NEPA.

## IV. *Integrity of the EIS*

Before considering the next claim it will be helpful to briefly set out the chronology of events leading up to the issuance of a permit to dump at New London.

### A. *Background*

The Navy's short original draft impact statement, prepared in January 1972, did not name a site for dumping. It provided simply that the dredge spoil would be disposed of "at a distance of approximately 23 to 50 miles from the mouth of the Thames River." [41] A number of the agencies to which the draft was circulated commented upon its deficiencies,[42] and the Navy hired Ecosystems to prepare a revised draft.

The revised draft, issued in May 1973, went into the issue of site selection much more thoroughly. The draft concluded that containment sites (those in which dumped spoil would remain) were preferable to dispersal sites [43] and that Long Island Sound was a poor disposal area. This latter conclusion was based partly on the Navy's own studies [44] and partly on comments received from the EPA.[45] The revised draft EIS recommended that the spoil be dumped at a previously used dump site, known as the Brenton Reef site, that lies off Newport in Rhode Island Sound.[46]

40. This fact distinguishes the present case from Life of the Land v. Brinegar, 485 F.2d 460 (9th Cir. 1973), cert. denied, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974), in which a consultant for a *state* agency prepared the EIS. The consultant's fee was computed upon a percentage of the cost of the entire project, so there was some self-interest in having the project approved. The Ninth Circuit approved the consultant's authorship of the EIS notwithstanding these considerations. 485 F.2d at 467–468. This court has previously indicated that approval of this sort of delegation is inconsistent with *Greene County. See* I–291 *Why?* Ass'n v. Burns, 372 F.Supp. 223, 246 n. 72 (D. Conn.1974); *cf.* Sierra Club v. Lynn, 502 F.2d 43, 59 (5th Cir. 1974). And Justice Douglas vehemently disapproved of this dele-

gation in dissenting from the Court's vacating of the injunction and stay he had ordered in dissenting from the Court's vacating of the injunction and stay he had ordered in the case. 414 U.S. 1052, 1053–1057, 94 S.Ct. 558, 38 L.Ed.2d 341 (1973).

41. Exh. 3, *supra* note 33, at 1 (because there is a covering letter, index, and cover sheet to the EIS, all unnumbered, this is actually the fifth sheet of paper in Exh. 3).

42. *See* Exh. 4, Revised Draft Environmental Impact Statement: Dredge River Channel ¶¶ 8.01–8.02, app. A (May 1973).

43. *See id.* ¶ 1.08.

44. *Cf. id.* ¶¶ 1.09, 2.11c.

45. *See id.* ¶ 1.09.

46. *See id.* ¶ 1.08 & fig. 3.

Exactly what happened thereafter is the subject of much dispute in this case. The following facts are fairly clear, however. On May 2, 1973, (before the revised draft EIS had been circulated) the Corps of Engineers refused as "premature" a request from the Navy for a permit to dump at Brenton Reef.[47] The Corps at that time questioned the economic desirability of dumping so far from the site of the dredging and indicated that it was awaiting the results of studies of the New London dump site. These results were issued on May 25, 1973, in a Naval Oceanographic Office study,[48] and the Corps began, in its own thinking, to lean heavily toward use of the New London dump site.[49] The Corps' scientific advisory group, the Scientific Subcommittee on Ocean Dredging, met on June 19, 1973, and actively considered using the New London dump site. This group has representatives from EPA, the National Oceanic and Atmospheric Administration, the U. S. Fish and Wildlife Service, and the Corps.[50] By the time that the Subcommittee next met, on July 13, 1973, it had moved to recognizing "the New London spoiling site as the best site to use at the present time; it saw no need to transport spoils to another site further

to the east."[51] The EPA commented on the revised draft EIS on July 3, 1973, noting that a recent legislative change had made consideration of dump sites within Long Island Sound possible.[52]

All this activity culminated in the Navy's issuance of an "Addendum" to the revised draft EIS on August 9, 1973, in which the dump site was changed from Brenton Reef to New London.[53] Public hearings were held on the revised EIS plus Addendum, and a final EIS, based in part upon the comments of the Corps, was issued in December 1973.[54] The fact that the Corps occupied a dual role as one of the commenting agencies to which the EIS was circulated and as the final decisionmaker has tended to cause some confusion in this case. But the Corps' function as a comment agency in no way diminished its sole responsibility to select a site, and thus the Navy reapplied to the Corps for a permit to dump at New London. After the local headquarters of the Corps got clearance from its national headquarters in Washington,[55] and after the Corps had given the EPA an opportunity, in conformity with the Water Pollution Control Act, 33 U.S.C. § 1344(c) (Supp. II, 1972), to "restrict or deny" dumping at New London,[56] a permit was issued to

47. *See* Exh. 7B, Letter from Col. Chas. J. Osterndorf (Corps) to Commanding Officer (Northern Div.), Naval Facilities Engineering Command, May 2, 1974.

48. This study is a part of Exh. 5 in this proceeding.

49. *See* Exh. 17, Draft Memorandum from Vyto L. Andreliunas (Corps) to Division Engineer, June 27, 1973.

50. *See* Exh. 6A, *supra* note 1, ¶ 1.11.

51. *See* Exh. 10, Record of Meeting of Scientific Subcommittee on Ocean Dredging and Spoiling 1–2 (July 20, 1973).

52. *See* Exh. 6A, *supra* note 1, at A2. The EPA conclusion that the law was changed to allow more flexibility to select sites in Long Island Sound is based on 33 U.S.C. § 1413(d) (Supp. II, 1972), which provides that the Secretary of the Army may authorize otherwise nonconforming dredge spoil dumping in the "ocean" if he concludes that

no other economically feasible method or site for disposal is available. *See* Exh. 6A, *supra* note 1, ¶ 1.09. The defendants here contend that restrictions on "ocean" dumping do not apply to dumping in Long Island Sound, *cf.* 33 U.S.C. § 1402(b) (Supp. II, 1972); the court does not need to determine the correctness of this contention.

53. The Addendum is part of Exh. 5 in this proceeding.

54. This final statement is in two volumes, which are Exhs. 6A & 6B in this proceeding.

55. *See* Exh. B, Memoranda from Col. John H. Mason (Corps New England Division Engineer) to HQDA (DAEN–CWO–N), March 1, 1974, and from Maj. Gen. J. W. Morris (DAEN–CWO–N) to Division Engineer, New England, March 18, 1974.

56. *See* Exh. E, Letter from Col. John H. Mason (Corps) to John McGlennon (EPA), March 27, 1974.

the Navy on April 29, 1974, to dump the dredge spoil there.[57]

### B. *Issues and Analysis*

An EIS for major federal projects is required to implement the congressional command that all federal agencies shall help "insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations . . . ." 42 U.S.C. § 4332(2)(B) (1970). The plaintiffs argue that since the EIS is supposed to be an input to decisions, it is naturally important that the decisions not be made first, with the EIS serving simply as a post hoc justification for them. The CEQ guidelines for the preparation of impact statements concur:

> "In particular, agencies should keep in mind that such statements are to serve as a means of assessing the environmental impact of proposed agency actions, rather than as a justification for decisions already made." [58]

The plaintiffs argue that this basic requirement for an EIS was not followed here—that the Corps made its site selection decision by June 27, 1973,[59] and that it was therefore made in spite of, rather than because of, data on the environmental impact of dumping at New London. The plaintiffs contend that the final EIS that the Navy issued in December 1973, containing the first detailed analysis of the New London site, was nothing more than a justification of this decision. The defendants, on the other hand, contend that the Corps' decision to use New London was not made until March 1974,[60] by which time all of the input required by NEPA to be part of an EIS had been provided. They argue that the decision was therefore made with due regard to its environmental impact and was entirely proper.[61]

On the parties' view of the case, the court's finding of the date of the Corps' decision to use New London is critical. Indeed, the defendants as much as conceded that if the court should find the facts to be as characterized by the plaintiffs they would lose this case.[62] The court cannot agree with the parties' view of the case, however. No matter when the Corps' decision to use New London was made, it is undisputed that it could have been altered until the last procedural step had been taken and the permit had been issued. Assuming *arguendo* that all of the necessary environmental data was at hand before the permit issued, the court is unwilling to invalidate the Corps' action as long as the Navy supplied and the Corps considered the data in good faith. If it were acting in good faith, the Corps would presumably reevaluate a decision if subsequent information showed it to be mistaken. And as long as this evaluation of all the necessary input occurs before the permit issues and the decision is finalized, it should not matter when the Corps "decides" to use a particular site.

Several factors compel the conclusion reached here. First, as noted earlier this year in I–291 Why? Ass'n v. Burns, 372 F.Supp. 223, 256–258 (D. Conn.1974), it is possible to cure defi-

---

57. *See* Exh. 11, *supra* note 18.

58. CEQ Guidelines, *supra* note 14, § 1500.-7(a) ; *see* Sierra Club v. Lynn, 502 F.2d 43, 59–60 (5th Cir. 1974) ; Environmental Defense Fund, Inc. v. Armstrong, 352 F.Supp. 50, 55 (N.D.Cal.1972), aff'd, 487 F.2d 814 (9th Cir. 1973) ; Daly v. Volpe, 350 F.Supp. 252, 259 (W.D.Wash.1972).

59. *See* Exh. 17, *supra* note 49. The plaintiffs also rely on statements in the final EIS that the Corps "directed" the Navy to use the New London site. *See* Exh. 6A, *supra* note 1, ¶¶ 1.12–1.13. However, the defendants deny that this occurred, maintaining that the Corps only recommended the New London site during this period. *See* Brief for Defendants 11. For further discussion, see note 143 *infra*.

60. *See* Exh. B, *supra* note 55.

61. The plaintiffs, of course, also dispute the contention that by March 1974 all of the requirements of NEPA were met. *See* pp. 1277–1292 *infra*.

62. *See* Transcript (Oct. 10, 1974) 67–68.

cient impact statements with timely "supplementals" that include the data necessary to make the EIS sufficient and have been properly circulated among the appropriate "comment agencies." [63] See Citizens for Mass Transit Against Freeways v. Brinegar, 357 F.Supp. 1269, 1274 (D.Ariz.1973); cf. Environmental Defense Fund, Inc. v. Froehlke, 368 F. Supp. 231, 236–237 (W.D.Mo.1973) (supplemental sufficient even though not circulated for comment). But see Daly v. Volpe, 350 F.Supp. 252, 259 (W.D. Wash.1972). If the Corps considered subsequent input in good faith, there would seem to be no reason to differentiate what has occurred in this case (in which supplemental data came in and was incorporated in the final EIS) from the cases cited above (in which the data was circulated in supplemental impact statements).

Second, the normal remedy when an EIS is found by a court to be deficient is an injunction and an order to shore up the statement. See, e. g., Natural Resources Defense Council, Inc. v. Morton, 337 F.Supp. 165 (D.D.C.1971), aff'd, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972). Even though the project may already be underway, all that is demanded is that the necessary data be collected and considered. It would seem anomalous to hold that these agencies, who at worst tried to correct whatever deficiencies may have existed when they decided in June 1973 to use New London, are to be treated more harshly than those who have to be ordered by the courts to take corrective action.

The plaintiffs' argument has substantial force in urging that the purpose of NEPA's requirement of an EIS was to make sure that the decisionmaker consider the environmental impacts of major projects. An EIS should not be simply a post hoc justification for a decision already made. However, the way to insure that the EIS is properly used is not to deny the use of supplemental statements after a preliminary decision is made, but to demand that these supplementals be prepared and considered in good faith. In the present case the good faith of the Corps and the Navy is admitted by the plaintiffs,[64] and the court finds no indications of bad faith by these agencies in the record before it. I therefore conclude that there is no violation of NEPA's EIS requirement if all of the information required by law was placed before the Corps in the form of an EIS and properly circulated supplementals in advance of the time the Corps issued the Navy a permit to dump at New London.

## V. Alleged Deficiencies in the EIS

What is considered next is the adequacy of the information before the Corps. The plaintiffs contend that the information was inadequate under NEPA standards in the several respects considered below.

### A. Cumulation of Impacts

One of the plaintiffs' claims is that the EIS is deficient because it assesses the impact of this dredge spoil disposal project in isolation. The plaintiffs argue that NEPA requires that the EIS contain data on the impact that this and all other similar projects will have.[65] They stress that this project is but a

---

63. See 42 U.S.C. § 4332(2)(C) (1970):
"Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, . . . shall accompany the

proposal through the existing agency review processes . . . ."
In the instant case all of the data that was collected was included, at least by reference, in the final EIS (Exhs. 6A & 6B). The plaintiffs have not complained that the EIS was not properly circulated for comment.

64. See Transcript (Oct. 10, 1974) 54.

65. See Plaintiffs' Memorandum, supra note 5, at 44–50.

part of the dumping which has occurred [66] or which may be expected to occur [67] at New London, and they argue that it is quite important for the decisionmaker to be given an overview of the impacts of dumping. For example, the plaintiffs contend that if such information had been in the EIS, it is "possible that looking at the magnitude of spoils involved, as well as dredged material from projects elsewhere in Long Island [Sound], Congress, or even the Corps itself, might have concluded that it was time to develop [a] container island project." [68]

In arguing that the Navy should have considered the impact of this and all other dumping, the plaintiffs rely upon the highway segmentation cases.[69] In those cases impact statements have sometimes been held deficient because they considered a deceptively small portion of a much larger project. See, e. g., Indian Lookout Alliance v. Volpe, 484 F.2d 11 (8th Cir. 1973); Conservation Soc'y v. Secretary of Transp., 362 F.Supp. 627 (D.Vt. 1973); Committee to Stop Route 7 v. Volpe, 346 F.Supp. 731 (D.Conn.1972).[70] The segmentation cases do not provide a

66. See Exh. D, Disposition Form, Sept. 19, 1974; Exh. 16, Stipulation ¶ 1. Since 1958 an average of approximately 240,000 cubic yards of spoil has been dumped at New London yearly. During the first eight months of 1972 a total of 2.1 million cubic yards of dredge spoil was dumped into the Sound.

67. See Exh. 16, supra note 66, ¶¶ 2–6; Exh. 15, Stipulation ¶¶ 1, 3. One of the points particularly urged by the plaintiffs is that the EIS should have considered the proposed dredging of the Thames to a depth of 40 feet by the Corps. See Plaintiffs' Memorandum, supra note 5, at 45–47. The point might be compelling if the objection were to the EIS' treatment of the dredging of the Thames, for the interrelationship of this aspect of the Navy project and the Corps project is clear. See Scientists' Inst. for Public Information, Inc. v. Atomic Energy Comm'n, 156 U.S.App.D.C. 395, 481 F.2d 1079, 1086–1088 (1973). With respect to the challenged dumping, however, the plaintiffs' point is less strong. The Corps is presently considering New London, inter alia, as a possible dump site, see Exh. 15, supra, ¶ 3, and the plaintiffs point out that the Navy's use of New London may serve as a precedent for the Corps' own, see Plaintiffs' Memorandum, supra note 5, at 46. It is still entirely a matter of speculation that New London will be chosen, however. It appears that the Corps' project, if approved, would not commence until at least 1980. See Exh. 15, supra, ¶ 4; Exh. 16, supra note 66, ¶ 6. Between now and then the Corps expects to undertake further studies to gather data about the best method of spoil disposal for this project. See Exh. 15, supra, attachment (Draft Environmental Impact Statement: New London Harbor and Thames River (Aug. 1972) 3. Moreover, with continued dumping at New London be-

tween now and 1980, the New London dump site might well be "full" by the time the Corps needs a dredge spoil disposal site. Cf. Exh. 7B, supra note 47 (Brenton Reef, as the disposal site for several other projects, may be too full to handle the Navy's Thames spoil). Thus the court gives no more weight to the Corps' proposal than to others which the plaintiffs urge should have been discussed in the EIS.

68. Plaintiffs' Memorandum, supra note 5, at 47.

69. See id. at 49.

70. The plaintiffs claim that this type of segmentation has been found improper in other contexts also, citing Hanly v. Kleindienst, 471 F.2d 823 (2d Cir. 1972), cert. denied, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973), and River Defense Comm. v. Callaway, 6 E.R.C. 1977 (S.D.N.Y. July 3, 1974). This court finds both of these cases inapposite. As will be seen infra, Hanly contains language somewhat relevant to another part of the plaintiffs' argument (that the EIS should have considered the incremental impact of this dumping on the Sound as a whole); however it says nothing about needing to consider the impact of other projects on the environment. In Hanly the federal project at issue was a mid-Manhattan jail, and there were no other federal projects in the area whose impacts the plaintiffs sought to cumulate with those of the jail. River Defense Comm. involved a challenge to a Corps permit allowing a private citizen to dump rocks in the Hudson River. The Corps had not considered, except in cursory terms, the impact of this action on marine life in the river. The court characterized this omission as considering the project as an isolated phenomenon and cited Hanly for the proposition that such consideration is insufficient. Hanly does support the holding insofar as it says that

coherent rationale for determining when the impacts of different projects must be cumulated in a nonhighway context. However, the District of Columbia Circuit has done so in a case considering whether an EIS is required for a projected wide-reaching technology development program. In Scientists' Inst. for Public Information, Inc. v. Atomic Energy Comm'n, 156 U.S.App.D.C. 395, 481 F.2d 1079 (1973), Judge Skelly Wright warned of the bandwagon effect some projects, there the nationwide breeder reactor project, have:

> "To wait until a technology attains the stage of complete commercial feasibility before considering the possible adverse environmental effects attendant upon ultimate application of the technology will undoubtedly frustrate meaningful consideration and balancing of environmental costs against economic and other benefits. Modern technological advances typically stem from massive investments in research and development, as is the case here. Technological advances are therefore

capital investments and, as such, once brought to a stage of commercial feasibility the investment in their development acts to compel their application. Once there has been, in the terms of NEPA, 'an irretrievable commitment of resources' in the technology development stage, the balance of environmental costs and economic and other benefits shifts in favor of ultimate application of the technology. . . ." [71]

In the instant case, however, there is no bandwagon effect. Dredging the Thames and dumping the spoil at New London involves only the slightest investment that will compel further actions;[72] this is a single project, almost entirely self-contained. Thus the court is unable to agree with the plaintiffs that the EIS should have considered the cumulative impact of this and all or any other projects. The plaintiffs' concern that many projects are going on, each of which is adding pollutants to the Sound, cannot be belittled. It may be true that as each incremental

the environmental impacts of a project must be taken into account; however, neither *Hanly* nor *River Defense Comm.* supports the plaintiffs' proposition that the impacts of all the projects in the area must be considered.

Although not cited to it by the plaintiffs, the court notes that Greene County Planning Bd. v. Federal Power Comm'n, 455 F.2d 412, 423–424 (2d Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972), also condemns segmentation (in this instance, of a power project). Like the highway cases, *Greene County* offers no discussion useful here; however, it can be explained by the rationale of Scientists' Inst. for Public Information, Inc. v. Atomic Energy Comm'n, 156 U.S.App.D.C. 395, 481 F.2d 1079 (1973), considered *infra*.

71. 481 F.2d at 1089–1090 (footnotes omitted). Judge Wright developed a balancing test to help protect against this bandwagon effect by requiring an early EIS when the effect is strong and the potential impacts serious:

> "Statements must be written late enough in the development process to contain meaningful information, but they must be written early enough so that whatever information is contained can practically

serve as an input into the decision making process.

> "Determining when to draft an impact statement for a technology development program obviously requires a reconciliation of these competing concerns. Some balance must be struck, and several factors should be weighed in the balance. How likely is the technology to prove commercially feasible, and how soon will that occur? To what extent is meaningful information presently available on the effects of application of the technology and of alternatives and their effects? To what extent are irretrievable commitments being made and options precluded as the development program progresses? How severe will be the environmental effects if the technology does prove commercially feasible?" 481 F.2d at 1094.

72. The parties have stipulated that approximately 200,000 cubic yards of spoil will be generated from maintenance of the Thames River channel through fiscal year 1980. *See* Exh. 16, *supra* note 66, ¶ 5. It is unclear how much, if any, of this figure represents additional maintenance required because of this project to deepen the existing Thames channel.

harm is imposed and as the Sound becomes more polluted the need to preserve the purity of the Sound will seem lessened to the next decisionmaker.[73] Thus a comprehensible survey providing an overview of both the Sound and the projects which would pollute it is eminently desirable, and the court is informed that such a study is presently being undertaken by a special multistate commission.[74] The duty to discuss the impact of all possible pollutants cannot be imposed on each isolated project, however. This is a single dredging operation unrelated to any other. The appropriate impact to consider in this case was the one actually considered: the impact of the dumping of the Navy's Thames River spoil.

## B. Impact Area to be Discussed

Another alleged deficiency in the EIS is closely intertwined with that just considered: the plaintiffs complain that it was not enough to consider the impact of the Thames spoil on the New London dump site. Instead, the EIS should have considered the impact of the spoil on the Sound as a whole, they argue.[75] To bolster this contention they adduce distinguished opinion that the Sound is a self-contained ecosystem in which interrelationships abound and any change affects the whole.[76]

There is not much authority for the plaintiffs to draw upon, and they rely mainly upon language addressed to a somewhat different issue in Hanly v. Kleindienst, 471 F.2d 823, 830–831 (2d Cir. 1972), cert. denied, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973) (citation omitted):

"In the absence of any Congressional or administrative interpretation of the term, we are persuaded that in deciding whether a major federal action will 'significantly' affect the quality of the human environment [and thus whether an EIS must be prepared] the agency in charge, although vested with broad discretion, should normally be required to review the proposed action in the light of at least two relevant factors: (1) the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area affected by it, and (2) the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area. Where conduct conforms to existing uses, its adverse consequences will usually be less significant than when it represents a radical change. Absent some showing that an entire neighborhood is in the process of redevelopment, its existing environment, though frequently below an ideal standard, represents a norm that cannot be ignored. For instance, one more highway in an area honeycombed with roads usually has less of an adverse impact than it if were constructed through a roadless public park.

. . .

"Although the existing environment of the area which is the site of a major federal action constitutes one criterion to be considered, it must be recognized that even a slight increase in adverse conditions that form an existing environmental milieu may sometimes threaten harm that is significant. One more factory polluting air and water in an area zoned for industrial use may represent the straw

---

73. *Cf.* S.Rep.No. 91–581, 91st Cong., 1st Sess. 5 (1969):
"Important decisions concerning the use and shape of man's future environment continue to be made in small but steady increments which perpetuate rather than avoid the recognized mistakes of previous decades."

74. *See* Brief for Defendants 8.

75. *See* Plaintiffs' Memorandum, *supra* note 5, at 44–50.

76. *See id.* at 47, *quoting* Henry L. Diamond, Comm'r of the New York State Dep't of Environmental Conservation, Exh. 6A, *supra* note 1, at A45.

that breaks the back of the environmental camel. Hence the absolute, as well as comparative, effects of a major federal action must be considered."

 Even if the plaintiffs' view of the law is correct, however, there can be no requirement that an EIS do what is scientifically impossible. At most the agency can be compelled to disclose the impossibility. *See* Scientists' Inst. for Public Information, Inc. v. Atomic Energy Comm'n, 156 U.S.App.D.C. 395, 481 F.2d 1079, 1092 (1973); Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 837 (1972). The defendants have presented uncontroverted evidence that it would be scientifically and practically very difficult, although desirable, to ascertain what impact the dumping of dredge spoil at the New London dump site would have throughout the entire Sound.[77] Although not specifically mentioned in the EIS itself, that uncertainty is clearly inferable from the fact that the EIS discloses scientific uncertainty as to the much narrower issue of whether this dumping project will adversely affect even the immediate environs of the dump site.[78] It would be meaningless for the court to require that an EIS which indicates that it is already at the bounds of scientific knowledge also indicate that inquiries beyond that frontier are not possible. No fault is found with the EIS on this score.

## C. *Consideration of Alternatives*

The plaintiffs make two claims of deficiency with respect to the consideration demanded by NEPA of alternatives to dumping at the New London site.[79] The first is that the treatment afforded those alternatives which were considered was inadequate.[80] Alternatives which the Navy considered may be broadly divided into two classes: alternative underwater disposal sites and alternative methods of disposal. The second of the plaintiffs' claims is that other alternatives existed that should have been considered but were not.[81]

### 1. *Treatment of considered alternatives*

 The requirement that alternatives be considered is one of the most stringent of all those governing impact statements; it is the "linchpin" of NEPA.[82] The purpose of NEPA, of course, is to insure that decisionmakers will make reasoned choices that take environmental impacts into account, so the comparison of alternatives is an absolute prerequisite to provide such choices to the decisionmaker and thus guarantee successful implementation of the Act. It is not enough to consider alternatives in a conclusory fashion in the EIS. Not only must the statement's drafter have a basis for his assertions, but also he must present enough of this data that those who must comment on the statement are able to evaluate his recommended

---

77. *See* Testimony of Dr. John B. Pearce, Transcript (Sept. 20, 1974) 425–431. As noted *supra* pp. 1279–1280, a special study is now underway to explore the Sound more fully. However the Navy should not have to await the results of what will undoubtedly be a massive study if their own environmental investigation has been adequate. *Cf.* Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275, 1279–1282 (9th Cir. 1973). The plaintiffs concede this point. *See* Transcript (Oct. 10, 1974) 60–61.

78. *See, e. g.,* Exh. 6A, *supra* note 1, ¶ 6.01: "there is little available information on what the long term ramifications are in terms of vegetation, finfish, shellfish or other benthic

organisms, or those higher organisms which live on marine biota. Thus there is no way to reasonably predict the affect [*sic*] of ocean dumping on long term productivity of the area."

79. *See* 42 U.S.C. § 4332(2)(C)(iii), (D) (1970).

80. *See* Plaintiffs' Memorandum, *supra* note 5, at 38–42.

81. *See id.* at 42–44.

82. *See, e. g.,* Monroe County Conservation Council, Inc. v. Volpe, 472 F.2d 693, 697–698 (2d Cir. 1972); I–291 Why? Ass'n v. Burns, 372 F.Supp. 223, 247 (D.Conn.1974).

choice.[83] Otherwise the comment process mandated by NEPA, 42 U.S.C. § 4332(2)(C) (1970), could not proceed intelligently, for those who comment would be forced to accept the drafter's conclusions on faith alone.

■ The defendants argue correctly that the requirement of discussing alternatives is subject to a rule of reason.[84] Certainly the impact statement need not study every alternative in the same detail as it considers the recommended course of action. What is required is that

> " 'the agency shall develop information and provide descriptions of the alternatives in adequate detail for subsequent reviewers and decision makers . . . to consider the alternatives along with the principle [sic] recommendations.' . . . 'Sufficient analysis of such alternatives and their costs and impact on the environment should accompany the proposed action through the agency review process in order not to foreclose prematurely options which might have less detrimental effects.' "[85]

Thus, although NEPA requires an investigation of alternatives,[86] it does not require an exhaustive study of an alternative about which so little is known that implementation would not be feasible. *See, e. g.*, pp. 1283–1284 *infra; cf.* Sierra Club v. Lynn, 502 F.2d 43 (5th Cir. 1974); Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827 (1971). Other alternatives may be environmentally worse than the one recommended (even though less expensive), and court will not

interfere (nor is anyone likely to ask it to interfere) when the agency itself summarily rejects an alternative as involving too much danger to the environment. *See* pp. 1283, 1285 *infra.*

■ Even though NEPA's requirements are flexible, however, the flexibility does not provide

> "an escape hatch for footdragging agencies . . . . Congress did not intend the Act to be such a paper tiger. Indeed, the requirement of environmental consideration 'to the fullest extent possible' sets a high standard for the agencies, a standard which must be rigorously enforced by the reviewing courts."[87]

If an agency would summarily reject an alternative it must at least indicate the basis for the summary rejection so that the comment process may be effective. *See* Scientists' Inst. for Public Information, Inc. v. Atomic Energy Comm'n, 156 U.S.App.D.C. 395, 481 F.2d 1079, 1092 (1973). It is extremely difficult to respond, for example, to a statement that an alternative is "too expensive." *Cf.* I–291 Why? Ass'n v. Burns, 372 F. Supp. 223, 248 (D.Conn.1974). On the other hand, if the statement is that the alternative is "too expensive because it would cost $5 billion," possibilities for comment abound. Many courts have agreed and required an economic-cost-benefit analysis to be included in the EIS. *See* Silva v. Lynn, 482 F.2d 1282, 1287 (1st Cir. 1973); Environmental Defense Fund, Inc. v. Froehlke, 473 F.2d 346, 352 (8th Cir. 1972); Montgomery v. Ellis, 364 F.Supp. 517, 522 (N.D.Ala. 1973); Conservation Soc'y v. Secretary

---

83. *See, e. g.,* Silva v. Lynn, 482 F.2d 1282, 1286–1287 (1st Cir. 1973); Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 836 (1972); Montgomery v. Ellis, 364 F.Supp. 517, 521–522 (N.D.Ala.1973). *But see* Fayetteville Area Chamber of Commerce v. Volpe, 386 F. Supp. 572 (E.D.N.C., Feb. 1, 1974).

84. *See* Defendants' Brief 16.

85. Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 833–834 n. 12 (1972), *citing* S.Rep.No.

91–296, 91st Cong., 1st Sess. 21 (1969); CEQ Guidelines, *supra* note 14. *See* Sierra Club v. Lynn, 502 F.2d 43, 62 (5th Cir. 1974); Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1118 n. 19 (1971).

86. *See* 42 U.S.C. § 4332(2)(D) (1970).

87. Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1114 (1971).

of Transp., 362 F.Supp. 627, 635 (D.Vt. 1973) (Oakes, Cir. J.); *cf.* Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1123 (1971); Daly v. Volpe, 350 F.Supp. 252, 259 (W.D.Wash.1972); EPA Regulations, Preparation of Environmental Impart Statements, 40 C.F.R. § 6.32(d) (1974):

> "Where practicable, benefits and costs should be quantified or described qualitatively in a way which will aid in a more objective judgment of their value. Where such an analysis is prepared, it shall be appended to the statement. . . . This analysis shall evaluate alternatives in such a manner that reviewers independently can judge their relative desirability. In addition, the reasons why the proposed action is believed by the Agency to be the best course of action shall be explained. . . ."

To summarize, NEPA does not require an infinite expansion of an impact statement, but it does not require a full disclosure of the basis on which the decision is to be made. *See* Monroe County Conservation Council, Inc. v. Volpe, 472 F.2d 693, 697 (2d Cir. 1972). Whether or not this full disclosure has been made is naturally a determination that must be made on a case-by-case basis. Thus I now turn to the "Alternatives" section of the Navy's EIS. Exclusive of maps, the EIS devotes only five pages to a direct discussion of alternatives to dumping spoil at the New London site.[88] The first alternatives considered are total or partial land disposal. The statement identifies five potential land disposal sites and concludes that they do not include sufficient area to make total land disposal feasible.[89]

With respect to partial land disposal, two of the sites are summarily rejected because they have been identified by other agencies as "areas of significant ecological importance." As indicated above, this is a proper ground for summary rejection of an alternative.[90] The other three potential areas are rejected in varying detail. The area of each is given and asserted to "be too small to allow settlement of the suspended solids from liquid dredge spoil before discharge back into the river."[91] This recital probably provides enough data with respect to the failure of solids to settle that one with some knowledge in the area would be able to comment on the accuracy of the Navy's assessment that spoil solids will return to the river.

▉▉ The second alternative considered is "dredge spoil farming," a technique in which the spoil is used to refurbish denuded areas. The Navy indicated that one type of spoil farming was being experimented with in Maryland, but that "there is insufficient information to justify large-scale use of the spoils in this manner."[92] Because of the reference to the Maryland experiment, the EIS has a sufficient basis for its rejection of this form of spoil farming. The Navy has revealed the source of the data on which it relied, which will give a commenting agency an opportunity to challenge the adequacy of the Navy's interpretation by looking at this data independently. *See* Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 837 (1972). Furthermore the grounds for the Navy's decision are prima facie proper: an agency is not required by NEPA's rule of reason to develop new technologies as alternatives.[93] With re-

---

88. *See* Exh. 6A, *supra* note 1, ¶¶ 5.04.a–5.04.t, at 178–183.

89. *See id.* ¶¶ 5.04a–5.04g.

90. *See* p. 1282 *supra.*

91. In addition one of the three sites is said to require an easement, to involve "excessive" cost, and to have insufficient lateral

support. *See* Exh. 6A, *supra* note 1, ¶ 5.04.e. The sufficiency of these reasons need not be considered in light of my conclusion that the Navy's rejection of land dumping is sufficiently justified by reference to its inefficiency.

92. *Id.* ¶ 5.04.h.

93. *See* p. 1282 *supra.*

**1284**

spect to two other types of spoil farming (use as fill in strip mines; use as fertilizer), however, the Navy did not claim insufficient information; its sole basis for rejecting these alternatives was stated in one short paragraph:

"The drawbacks to these alternatives include great distance and transportation costs in addition to the political jurisdictional problems associated with long distance transportation of the spoils, truck or rail traffic with the resultant increases in noise and air pollution, possible leaching of toxic materials from the spoils and the subsequent contamination of land and water resources." [94]

While this is terse, it is adequate. The EIS contains a thorough chemical analysis, sufficient to disclose to commenting agencies its possibility for use as fertilizer. There are no strip mines in this district, and it is obvious that transportation overland is much more costly than transportation by barge for two-and-one-half miles out to the New London dump site.

The third alternative considered is incineration. This alternative is also under study elsewhere: "Lockheed Shipbuilding and Construction Company, Seattle, Washington, has designed a waterborne waste treatment system utilizing old ship hulls." [95] The Navy's rejection of incineration is summary,[96] but, as above, the reference to a known project suffices to avoid a deficiency in the EIS. Likewise, in considering container disposal the EIS refers to a detailed study of containerization of spoil made by the Corps in the EIS for one of its projects; [97] finding that the results (especially in terms of cost) are less desirable than those of other alternatives, the Navy summarily rejects containeriza-

tion. The court holds that the Navy EIS has given sufficient consideration to this alternative.

The Navy EIS gives somewhat more detailed attention to the possibility of building islands out of the dredge spoil.[98] Several ongoing experiments are cited that to date have received favorable reports. However the Navy rejects the idea quickly on several bases:

"Against the development of such islands is the lack of information concerning the impact such construction would have on marine life in the area. An extensive environmental impact study would need to be completed before such a project could go forward. Impediment to navigation and aesthetics in the areas chosen are also negative aspects which must be considered. Not all material from dredging operations is suitable for island construction. Much of the dredged material would be unsuitable and would need to be separated and disposed of elsewhere. . . . [T]he cost of utilization of disposal islands would be exceedingly high under current practices and . . . there would be jurisdictional problems surrounding control of ultimately chosen sites." [99]

The court finds these reasons for rejecting this alternative entirely sufficient under the rule of reason. The idea seems to involve environmental risks from erosion of the island wherever built in exactly the same way that use of the New London dump site poses dangers from erosion and dispersal of the dredge spoil. Thus, whatever the benefits to be expected from this alternative, they will not be such as to alleviate all the problems posed by the alternative the Navy has proposed. On the negative side, it is obvious that to separate the

---

94. Exh. 6A, *supra* note 1, ¶ 5.04.k.

95. *Id.* ¶ 5.04.l.

96. "The problems associated with this approach include possible air pollution, possible adverse affects [*sic*] of the ash residue in an ocean ecology and the large time factor necessary for the development of a workable

system. In addition the cost would be substantially greater, at the outset than other methods." *Id.*

97. *See id.* ¶ 5.04.m.

98. *See id.* ¶ 5.04.n.

99. *Id.*

spoil would be quite expensive, and enough is revealed about the composition of this material that those who must comment should be able to knowledgeably evaluate the Navy's claim that the cost would be "exceedingly high."

Having considered alternative methods for disposing of the spoil, the next matter to be considered is the information revealed in the statement relating to alternative sites for underwater disposal.

Dumping at dispersal sites (sites which will foster dispersal of the spoil) is quickly rejected because scientists do not agree on the long-range effects on marine biota of spoil intake and because current scientific opinion * advises against the use of dispersal sites on environmental grounds.[100] The court has already indicated that this type of summary treatment of an alternative is proper;[101] in any event, the plaintiffs do not seem to challenge the EIS' treatment of a dispersal-site alternative.

The plaintiffs emphatically challenge the Navy's consideration of alternative containment sites.[102] A page and a half of the EIS' treatment of alternatives is devoted to consideration of three alternative containment sites in Long Island Sound ("Sites 1, 2, and 3"). Site 2, located in the plains area northwest of Block Island, is rejected because the environmental impact of dumping there would be disastrous; this conclusion is not attacked by the plaintiffs, and the court finds the Navy's treatment of this site entirely proper.[103]

The Navy rejected Sites 1 and 3 because it lacked sufficient information about the environmental impacts which would occur should the spoil be dumped at these sites.[104] A preliminary question is whether the Navy was completely

excused from developing such information about these or any other sites in Long Island Sound. In its comments on the January 1972 draft EIS the EPA indicated that Long Island Sound should not be considered as a potential dump site,[105] a recommendation that the Navy adopted.[106] It was not until mid-1973 that changes in thinking by EPA and the Corps led the Navy to believe that the use of a dump site in Long Island Sound was permissible. No more than six months later, the final EIS, recommending the New London site, was released.[107] Given this chronology, it is not at all surprising that the Navy lacked data on alternative disposal sites within Long Island Sound. The real question is whether, under the circumstances, the Navy was obligated in mid-1973 to delay its EIS, its dredging project, and its deployment of the SSN 688 submarine in order to generate this data. Or, to put it in other words, does the fact that the Navy legitimately excluded the Sound from consideration until mid-1973, combined with the defense interest in deployment of the new submarine class, excuse what might otherwise be deficient treatment of alternative containment sites by the EIS?

 The court must conclude that the Navy's obligation to discuss Sites 1 and 3 is not excused. It appears that no court has ever been asked to rule on the sufficiency of the consideration of alternatives where there had arisen a situation similar to the Navy's prior justifiable exclusion of the Sound. However, I believe there is guidance in the cases of a couple of years ago dealing with whether an EIS was required for projects begun before the effective date of NEPA. In those cases courts were also

100. See id. ¶ 5.04.o.

101. See p. 1282 supra.

102. See Plaintiffs' Memorandum, supra note 5, at 42–44.

103. See pp. 1282–1283 supra.

104. See Exh. 6A, supra note 1, ¶¶ 5.04.q, 5.04.t.

105. See Exh. 6B, 2 Final Environmental Impact Statement: Dredge River Channel, at H10.

106. See id. at Ill; p. 1275 supra.

107. See pp. 1275–1276 supra.

faced with "innocent" agencies, for they had laid their plans and begun their work before there was any requirement of an EIS. Most courts found that NEPA did not apply retroactively to invalidate projects that had received final approval before the Act became applicable, but that it did apply to ongoing projects, *i. e.*, those in which decisions were yet to be made.[108] The latter group of cases is more closely analogous to the posture of the Navy's dredging project as of mid-1973. When EPA withdrew its objections to a Long Island Sound site the Navy had circulated a revised draft EIS, but the final site decision had not been made, and the dredging contract had not been awarded. The project was still in the planning stage and, by analogy to the cases cited above, subject to all the requirements of NEPA. Thus, even though the consideration of Long Island Sound alternatives might properly have been summary before mid-1973, thereafter the Navy could not rely on lack of information per se as a basis for rejecting alternative sites.

Neither is the Navy project excused from fully considering the Long Island Sound alternatives because of the importance of dredging the Thames in time to accommodate the first of the new submarines. As the Sixth Circuit pointed out in Environmental Defense Fund v. TVA, 468 F.2d 1164 (6th Cir. 1972), NEPA clearly requires that

" 'each agency of the Federal Government shall comply with the directives [of NEPA] unless the existing law applicable to such agency's operations expressly prohibits or makes full com-

pliance with one of the directives impossible. . . .' . . . Accordingly, if the . . . Project is subject to the NEPA, appellants should not be permitted to rely upon '[c]onsiderations of administrative difficulty, delay or economic cost' to support a claim of exemption. . . ." [109]

Because the Navy's project was concededly subject to NEPA, this court must conclude that Congress' intent was that the environmental concerns protected by NEPA would outweigh any interest of the Navy that would be harmed by full compliance with the Act.

 •Thus the question arises whether, under the rule of reason, the Navy's treatment of Sites 1 and 3 in the EIS was adequate to meet the requirements of NEPA. In answering this question, it is important to understand how the rule of reason applies in this case. Thus it is important to realize how limited is current scientific knowledge, even with the best of testing procedures, with respect to the environmental effects of dredge spoil disposal. The Corps has said:

"With the existing data, it is almost impossible to differentiate between effects from one site to another, and there is a very obvious need to vigorously pursue a continued research program to fill in the many gaps that exist." [110]

Moreover, it is important to recognize that the Navy and the Corps are actively pursuing such research, largely by means of studying what happens to the spoil dumped at New London.[111] "Con-

---

108. *See* Arlington Coalition on Transp. v. Volpe, 458 F.2d 1323, 1331–1332 (4th Cir.), cert. denied, 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972) ; Greene County Planning Bd. v. Federal Power Comm'n, 455 F.2d 412, 424–425 (2d Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972) ; Conservation Soc'y v. Volpe, 343 F.Supp. 761, 765–767 (D.Vt.1972), and cases cited therein.

109. 468 F.2d at 1175–1176, *quoting* H.Rep. No. 91–765, 91st Cong., 1st Sess. 9–10

(1969), *and* Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1115 (1971).

110. Statement of Morgan Rees, Chief of Permits Branch (Corps), at Public Hearing in Groton, Conn., Aug. 28, 1973, Exh. 6B, *supra* note 105, exhibit A, at 29.

111. *See* Exh. 6A, *supra* note 1, ¶¶ 1.15–1.17.

gress has recently authorized the Corps to undertake a nationwide 5-year $30 million research program to study the effects of spoil disposal." [112] This type of detailed research obviously cannot be done in a vacuum—what is required is some dumped dredge spoil whose fate can be studied. The cases do not permit the courts to establish a timetable for the ascertainment of standards and methods for measuring the effect of the motion of the sea upon the dispersal of the separate ingredients in the spoil. Whether to proceed without such a study or to postpone the project while such a study is being undertaken is a question for the decisionmaker. Environmental Defense Fund, Inc. v. Corps of Eng'rs, 325 F.Supp. 749, 760 (E.D. Ark.1971), adhered to, 342 F.Supp. 1211 (E.D.Ark.), aff'd, 470 F.2d 289 (8th Cir. 1972), cert. denied, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973).

The rule of reason is also informed by the scope of the risk that the project would create. In this instance polluted material which is attributable to sources other than the Navy project is being removed from the Thames River, which can only have a beneficial effect on the marine life located in the river,[113] to be disposed of elsewhere, further from shore and deeper under water. The EIS has done a good job in considering what will happen in the immediate environs of the site at which it is disposed; [114] at is-sue is whether or not the spoil will thereafter disperse and, to some extent, the danger that will be posed should it disperse. It is noteworthy that although other dredge spoil from Connecticut, including much from the Thames River, has previously been dumped at New London,[115] the plaintiffs have presented no evidence that this prior disposal has dispersed and harmed the marine life along the Connecticut shore that they seek to protect by this action. Thus the scope of the risk of this dumping, while perhaps not insubstantial, by no means amounts to a certainty of significantly adverse environmental damage.

The Navy contends that in light of these factors the rule of reason demands no more than has been provided. With respect to Site 3 there is almost a page of discussion about environmental impacts that might be expected should the Thames spoil be dumped there.[116] With respect to Site 1 the individualized consideration is less extensive, but the EIS does indicate that a significant danger of environmental harm is indicated by an analysis of the site's water chemistry and bottom substrate.[117] In addition, much generalized material about the characteristics of eastern Long Island Sound, where Site 1 is found, is contained in earlier portions of the EIS. The court concludes that these provisions of information are adequate, in light of the rule of

112. Statement of Morgan Rees, *supra* note 110, at 28; *see* Statement of Col. John H. Mason (Corps) at Public Meeting in Groton, Conn., Sept. 11, 1973, Exh. 6B, *supra* note 105, exhibit B, at 38–39.

113. There is some dispute as to the current effects of pollution on marine life in the Thames. The EIS states that "the taking of oysters, clams, and quahogs is presently prohibited within the Thames River and New London Harbor due to gross contamination." Exh. 6A, *supra* note 1, ¶ 3.07.a; *see* Exh. 14, *supra* note 8, at 10. On the other hand, the Department of the Interior, in commenting on the initial draft EIS, indicated: "According to the State of Connecticut Department of Environmental Protection, the Thames River is currently classified as SC (suitable for fish, shellfish and wildlife habitat, recreational boating, and industrial cooling and shellfish harvesting after depuration; excellent fish and wildlife habitat; good aesthetic value)." Exh. 6B, *supra* note 105, at 17. Both assessments conclude that the Thames is a home for commercial and recreational fishing.

114. *See* Exh. 6A, *supra* note 1, ¶¶ 3.17–4.08.

115. Exh. D, *supra* note 66, provides a list of the sources of all dumpings at the New London site for which permits were issued between 1958 and 1972. The total dredged spoil dumped amounts to 3,356,298 cubic yards.

116. Exh. 6A, *supra* note 1, ¶¶ 5.04.p–5.04.q.

117. *Id.* ¶ 5.04.t.

reason, to satisfy the Navy's duty to consider alternatives under NEPA. *Cf.* Fayetteville Area Chamber of Commerce v. Volpe, 6 E.R.C. 1891 (E.D.N.C. Feb. 1, 1974).

The plaintiffs also challenge the impact statement's consideration of the so-called "acid site," which lies about ten miles southeast of Block Island.[118] However, I must reach a conclusion with respect to this claim similar to that reached with respect to the claims considered above, even though the plaintiffs have particularly urged that the acid site deserved full consideration in the EIS because it is the primary alternative to the New London site. The Corps' Scientific Subcommittee on Ocean Dredging recommended and the Navy agreed to this site for study concurrent with the use of the New London dump site in case adverse effects at New London should necessitate relocation of the dumping.[119] Moreover, the Corps requested and the EPA gave the acid site provisional certification as a dump site in September and October 1973, which was after the Navy recommended use of New London but before the final EIS was issued.[120]

The treatment given the acid site in the EIS is brief: its selection for concurrent study is disclosed as is the fact that to use this site, if technically feasible,[121] would cost "at least $8 million more than using the New London dumping ground."[122] The brevity of this treatment cannot be equated with inadequacy, however. The acid site alternative is of uncertain technical feasibility, is almost twice as expensive to use as the New London alternative, and is to be studied concurrently with use of the New London dump site. Especially given the Corps' rational policy of preferring to use established dump sites (about which more is and can be known) when possible,[123] the court does not find summary treatment of the acid site in the EIS violative of the rule of reason. Indeed it would make little sense to exhaustively study such an expensive and uncertain alternative when the study will be necessarily inconclusive.[124] The consideration of this alternative is sufficient to satisfy the Navy's obligations under NEPA.

#### 2. *Development of alternatives*

■ The duty to actively develop alternatives stems from the same authority as the duty to discuss fully those alternatives that are considered—42 U.S. C. §§ 4332(2)(C)(iii), (D) (1970). And the duty to actively develop alternatives is also subject to a rule of reason similar to that considered above: not every alternative that anyone could dream up must be given the full treatment that NEPA demands for those alternatives that are considered (and are not summarily rejected for proper reasons). *See, e. g.,* Life of the Land v. Brinegar, 485 F.2d 460, 470–472 (9th Cir. 1973), cert. denied, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d

---

118. *See* Plaintiffs' Memorandum, *supra* note 5, at 42–43. This site is marked "*A*" on Exh. 1, *supra* note 2.

119. *See* Exh. 6A *supra* note 1, ¶¶ 1.11b, 1.17.

120. *See* Exh. E, Letter from Col. John H. Mason (Corps) to Regional Administrator, EPA, Sept. 27, 1973; Letter from Jeffrey G. Miller (EPA) to Col. John H. Mason, Oct. 25, 1973.

121. In requesting provisional certification of the site by the EPA Col. Mason of the Corps wrote: "Use of this dumping ground presumes that certain questions of the phys-

ical capability of tow boats and scows to haul to an exposed area are overcome." Exh. E, Letter (Mason to EPA), *supra* note 120.

122. Statement of Morgan Rees, *supra* note 110, at 27. Rees also indicated that it would cost about $9½ million to use the New London dump site and about $17.3 million to use Brenton Reef. *Id.*

123. *See, e. g., id.* at 24.

124. *See* pp. 1286–1287 *supra*; *cf.* Fayetteville Area Chamber of Commerce v. Volpe, 6 E.R.C. 1891 (E.D.N.C. Feb. 1, 1974).

827, 834–838 (1972); I–291 Why? Ass'n v. Burns, 372 F.Supp. 223, 251–252 (D.Conn.1974).

The rule of reason seems especially important in a case like this, where the issue is consideration of alternative offshore containment sites. Unless the Navy studied in the detail required for considered alternatives all of Long Island, Block Island, and Rhode Island Sounds, plus portions of the surrounding ocean, it is obvious that someone would be able to name a site that had not been explored. Obviously the Navy's failure to make this complete study (the magnitude of which would have been far greater than any other oceanographic effort of which this court is aware) should not preclude it from disposal of its dredge spoil. The rule of reason applied sensibly to this type of case requires only consideration of enough feasible alternatives that a reasoned choice can be made by the decisionmaker.[125] See Friends of the Earth v. United States Environmental Protection Agency, 499 F.2d 1118, 1126 (2d Cir. 1974); Natural Resources Defense Council, Inc. v. United States Environmental Protection Agency, 494 F.2d 519, 524–525 (2d Cir. 1974). The plaintiffs' claims that the Navy EIS has not considered some feasible alternative containment sites[126] must be examined in light of this rule.

The plaintiffs first commend to the Navy in a general way "[d]eeper sites, further removed from shore, with pa-rameters far more clearly evidencing containment."[127] Read most charitably, this formulation suggests that the Navy should have found an example of a deep site far offshore and included an analysis of it in the EIS so that the decision-maker could see the cost of achieving better containment than is possible in sites closer to the shore. In making this argument, however, the plaintiffs ignore the fact that the Navy had concluded that, although knowledge in the area is slight, current scientific opinion advised against adding pollutants to deep ocean areas.[128] It appears, in other words, that the Navy concluded that the sites proposed by the plaintiffs were not feasible and consideration of them thus would not aid the decisionmaker in reaching a reasoned choice. This court does not find fault with this conclusion.[129]

The plaintiffs also argue that the Brenton Reef site, recommended by the Navy in the revised draft EIS (Exh. 4), was completely and improperly dropped from consideration in the final EIS. They contend that this alternative, above all, should have been considered in the impact statement.[130] However, the defendants correctly point out that the final EIS incorporates by reference the discussion of Brenton Reef in the revised draft EIS.[131] Thus the only question with respect to the EIS' treatment of Brenton Reef can be whether it was deficient; this issue the plaintiffs specifically decline to raise.[132]

125. Of course this rule is not meant to allow an agency to ignore feasible alternatives presented to it simply because it has already considered enough alternatives to survive judicial review of the EIS. Cf. I–291 Why? Ass'n v. Burns, 372 F.Supp. 223, 249–252 (D.Conn.1974).

126. See Plaintiffs' Memorandum, supra note 5, at 42–44.

127. Id. at 44.

128. See Exh. 6A, supra note 1, ¶ 5.04.o.

129. Cf. pp. 1282–1283 supra.

130. See Plaintiffs' Memorandum, supra note 5, at 43–44.

131. See Brief for Defendants 16, citing Exh. 6A, supra note 1, ¶ 2.22.c.

132. See Transcript (Oct. 10, 1974) 8–9:
"THE COURT: Now your contention, I guess, is that this third or this revised draft submitted by the Navy was satisfactory?
"MR. BUTZEL: There were limits in it which need not be discussed in terms of the revised draft. For your information, if there had been a litigation over the re-

### VI. Alleged Errors in the Impact Statement

The plaintiffs make three additional claims with respect to the impact statement: (1) that the role of the Corps' Scientific Advisory Subcommittee in the decisionmaking process was misreported by the final EIS;[133] (2) that the change between the revised draft and final statements in the conclusion as to which site was the "best" containment site environmentally (Brenton Reef in the revised draft EIS; New London in the final EIS) was unsupported by any evidence;[134] and (3 that the finding of the Naval Oceanographic Office study that the New London site exhibited short term containment was unfounded.[135]

■ The standard of review to be applied to these sorts of challenges differs from the strict "procedural" standard used above.[136] At issue here is not whether the agency has turned square corners in following the procedures demanded by NEPA, but whether its findings are supported. With respect to this type of issue the test is whether the agency has acted arbitrarily and capriciously or on the basis of insubstantial evidence.[137] *See* Conservation Soc'y v.

Secretary of Transp., 362 F.Supp. 627, 632–633, 635 (D.Vt.1973); Environmental Defense Fund, Inc. v. Corps of Eng'rs, 342 F.Supp. 1211 (E.D.Ark.), aff'd, 470 F.2d 289 (8th Cir. 1972), cert. denied, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973). This standard, of course, is precisely that to which most agency findings are subjected during judicial review under the Administrative Procedure Act, 5 U.S.C. § 706 (1970). *See, e. g.,* Wong Wing Hang v. Immigration & Naturalization Serv., 360 F.2d 715, 717–719 (2d Cir. 1966).

### A. The Role of the Scientific Advisory Subcommittee

■ The plaintiffs' first claim of error is based on the impact statement's description of the role of the Corps' Scientific Advisory Subcommittee in influencing the Navy to change from its recommendation of Brenton Reef in the revised draft EIS to its advocacy of the New London dump site in the final EIS. The Navy's description is summarized as follows:

> "As a result of the *recommendations* of the Scientific Advisory Subcommittee, the Navy has been directed by the Army Corps of Engineers to

---

vised draft I think it would have been over the inadequate consideration of alternatives there and the alternative section —which I will reach in terms of the New London site.

"But in terms of its determination as to an appropriate site, the kind of research that had been done, the kind of study and consideration that had been given to the selection of Brenton Reef, it was in my judgment an adequate impact statement."

133. *See* Plaintiffs' Memorandum, *supra* note 5, at 25–28.

134. *See id.* at 28–35.

135. *See id.* at 35–37.

136. *See* pp. 1272–1273 *supra.*

137. Inevitably, bright lines turn dim when it becomes necessary to characterize individual fact situations. Thus in this instance all of the alleged errors could be characterized as

"procedural," for their effect is to make deficient the EIS ultimately set before the decisionmaker. For example, inasmuch as the first of these three claims alleges mischaracterization of the Subcommittee's role, it might be regarded as a bias in the EIS rather than as an erroneous agency finding. *Cf.* pp. 1273–1274 *supra.* However, I am convinced that it is proper to review these claims using the "substantive" standard described in the text.

Some of the statements to which this standard will apply are conclusions about which site is best (*e. g.,* the second of these three claims). In the mouth of the decisionmaker this conclusion is subjected to review only for arbitrariness, see, *e. g.,* Conservation Soc'y v. Secretary of Transp., 362 F.Supp. 627, 632–633 (D.Vt.1973). To subject the same conclusion in the mouth of another to a stricter standard would achieve nothing, and I conclude that NEPA does not require the court to do so.

utilize the New London Dumping Ground." [138]

It is the emphasized language that the plaintiffs claim constitutes a distortion. Specifically, they say that the Subcommittee only concurred in the Corps' recommendation of the New London site, an interpretation based on documents by the Corps to that effect. [139] According to the plaintiffs, this misstatement of the Subcommittee's role made it appear that the switch to the New London dump site was made on the basis of scientific considerations rather than on the basis of cost and other considerations.

The defendants do not deny that this characterization of the Subcommittee's role is incorrect; [140] in fact, the Corps itself first objected to this language. [141] However, the defendants do argue that this mistake is not sufficiently serious to invalidate the EIS. *See* Environmental Defense Fund, Inc. v. Corps of Eng'rs, 342 F.Supp. 1211 (E.D.Ark.), aff'd, 470 F.2d 289 (8th Cir. 1972), cert. denied, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973). The court agrees. The EIS does not, as a whole, distort the role played by the Subcommittee. In fact exactly the point contended for by the plaintiffs—that the Subcommittee's decision was made on the basis of cost and other considerations—is explicitly made by the EIS. [142] The Navy's misstatement is simply harmless error. [143]

## B. *The Final Impact Statement's Conclusion*

The conclusion of the revised draft EIS was:

"Of the several containment sites, the most environmentally suited for the material to be disposed of is the previously spoiled dump site in Rhode Island Sound [Brenton Reef] . . . ." [144]

By the time the final EIS was issued, the Navy's conclusion had changed: [145]

"Of the several relative containment sites, the most environmentally suited for the material to be disposed of is the previously spoiled dump site in Long Island Sound [New London] . . . ." [146]

The plaintiffs claim that there is no scientific data to support this change and that, measured by containment ability, Brenton Reef remained clearly the "most environmentally suited." The plaintiffs have built a strong and careful case in their brief, citing studies of Brenton Reef and analyzing the limited scope of the Navy's study of New London, to try to show that the conclusion of the final EIS is erroneous. However, this court does not sit in judgment of the conclusion's correctness; it must stand if it is not arbitrary and capricious and if there is substantial evidence to support it.

The court is unable to conclude that the Navy's conclusion was arbitrary and capricious or unsupported by substantial

---

138. Exh. 6A, *supra* note 1, ¶ 1.12 (emphasis added). Language of similar import appears elsewhere, both in the final EIS and in other spots as well. *See, e. g.*, Exh. 5, Addendum, *supra* note 53.

139. *See, e. g.*, Exh. 9, Memorandum from Vyto Andreliunas (Corps) to Division Engineer (Corps), Jan. 23, 1974.

140. *See* Brief for Defendants 10–11.

141. *See* Exh. 9, *supra* note 139.

142. *See* Exh. 6A, *supra* note 1, ¶ 8.02, at 194.

143. The plaintiffs also complain about statements in the final EIS that the Corps "di-

rected" the Navy to choose the New London site as its recommended alternative, *see id.* ¶¶ 1.12–1.13, even though the defendants now contend that the Corps only recommended New London while the EIS was in preparation. *See* Brief for Defendants 11. The court is unable to believe that any misimpression was created and refuses to set a precedent that would require a project to be halted because of one or two poorly worded passages in a lengthy two-volume EIS.

144. Exh. 4, *supra* note 42, ¶ 1.08.

145. See pp. 1274–1277 for a description of the intervening events.

146. Exh. 6A, *supra* note 1, ¶ 1.08.

evidence. There was expert testimony at the hearing on this matter that on the basis of present scientific knowledge there is no way to tell whether Brenton Reef or New London is a better site with respect to containment characteristics.[147] This expert evaluation was by Dr. John B. Pearce, who chaired the meetings of the Scientific Advisory Subcommittee, and Dr. Pearce indicated that this opinion was generally shared by that body.[148] All parties take it as granted that the ecological problem presented by this case is one which can best be analyzed and solved by scientists. The court concludes that the evidence presented is enough to meet the relatively light burden placed upon the Navy by the "substantive" standard of review.

## C. *The Naval Oceanographic Office Study*

The plaintiffs' third claim is that the purported finding of the Naval Oceanographic Office (NAVOCEANO) study of the New London dump site (appendix J to the final EIS) that short-term containment exists at that site is unsupported. This claim is based on (1) the finding's alleged inconsistency with the fact that at current speeds evidenced at the dump site resuspension of sediments occurs, and (2) the finding of the study that oil and grease sediments previously deposited at the New London site have been scoured therefrom by current action.

Once again, however, the court is unpersuaded. Dr. Pearce testified that although certain sediments could be scoured away by currents of the velocity evidenced here, there is evidence that the dredge spoil was not so susceptible of erosion.[149] Thus there is no clear inconsistency with the NAVOCEANO finding of short-term containment. Moreover, the finding of sediment scouring upon which the plaintiffs rely was

subsequently withdrawn by the Oceanographic Office because it was found to be unsupportable.[150] The agencies involved did not arbitrarily and capriciously or without substantial evidence conclude that the New London dump site exhibited short-term containment.

## VII. *The Corps' Selection of New London*

The plaintiffs' final challenge goes to the ultimate decision of the Corps to use the New London site for disposition of the Navy's Thames River dredge spoil.[151] Because this is directed squarely to the substance of the project, the plaintiffs concede that the "arbitrary and capricious" standard applies. However, they maintain that in this instance even this low standard is violated.

▉▉▉▉ The plaintiffs' argument must be rejected, however. Above I have indicated that none of the errors of procedure or substance alleged by the plaintiffs have been committed by the Navy or the Corps. Throughout I have stressed the careful nature of the decisionmaking process undertaken for this project. Three draft impact statements and an addendum were properly circulated; public meetings were held; the Corps and the Navy cooperated to achieve a mutually satisfactory result; a special scientific subcommittee reviewed the data provided about environmental effects. From all of this it should by now be clear that the Corps' ultimate decision to use New London cannot seriously be claimed to be unsupported or arbitrary and capricious. At worst it may not have been a perfect decision—some better method or site for disposal might exist; some different weighings of the economic and environmental trade-offs involved might be "better" in an abstract sense. But these are issues upon which this court does not sit in judgment. With respect to

147. *See* Testimony, *supra* note 77, at 406–420, 441–451.

148. *See id.*

149. *See id.* at 413–417, 450–451.

150. *See* Testimony of Dr. Richard E. Smith (NAVOCEANO), Transcript (Sept. 12, 1974) 306–308, 328–335.

151. *See* Plaintiffs' Memorandum, *supra* note 5, at 54–58.

those issues on which I am obligated to pass, the defendants carry the day in every respect.

The plaintiffs' requests for relief are each denied. It is

So ordered.